# SUPREME COURT,

## STATE OF KANSAS.

# JULY TERM, 1881.

### PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, ⎱ Associate Justices.
Hon. DAVID J. BREWER, ⎰

---

THE BOARD OF EDUCATION OF THE CITY OF OTTAWA, *et al.*,
v. LESLIE TINNON, *by his next friend*, ELIJAH TINNON.

COLORED CHILDREN—*Rights of, in Common Schools.* Sections 2 and 9, chapter 122, article 11, of the laws of 1876, relating to cities of the second class (Comp. Laws of 1879, pp. 846, 847), read as follows:

"Sec. 2. In each city governed by this act there shall be established and maintained a system of free common schools, which shall be kept open not less than three nor more than ten months in any one year, and shall be free to all children residing in such city between the ages of five and twenty-one years. But the board of education may, where school-room accommodations are insufficient, exclude for the time being, children between the ages of five and seven years."

"Sec. 9. The board of education shall have power to elect their own officers, except the treasurer; to make their own rules and regulations, subject to the provisions of this article; to organize and maintain a system of graded schools; to establish a high school whenever in their opinion the educational interests of the city demand the same; and to exercise the sole control over the schools and school property of the city."

The fourteenth amendment to the constitution of the United States provides, among other things, as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Board of Education v. Tinnon.

Assuming, for the purposes of this case, that the legislature has the power to authorize the board of education of any city, or the officers of any school district, to establish separate schools for the education of white and colored children, and to exclude the colored children from the white schools, notwithstanding the fourteenth amendment to the constitution of the United States, yet, *held*, that the legislature has not passed any act giving any such power or authority to the boards of education of cities of the second class, and that boards of education of cities of the second class have no power to exclude colored children from any of the schools of the city, where there is no reason for their exclusion except merely that they are colored.

*Error from Franklin District Court.*

MANDAMUS, brought by *Leslie Tinnon,* a colored boy of school age, by his next friend, Elijah Tinnon, to compel the *Board of Education of the City of Ottawa,* and *William Wheeler,* the principal of the public schools of said city, to permit the plaintiff to attend a certain one of such schools. Certain exhibits were attached to and made a part of the petition, as follows:

EXHIBIT A.

At a meeting held May 19, 1880, the committee on buildings and grounds reported as follows:

We would further recommend that the colored children in rooms Nos. 1, 2, 3, 4, 5 and 6 be placed in the frame school house, and a teacher of their own color be employed to instruct them; and that they be advanced into rooms Nos. 7, 8, 9, 10, 11 and 12 as fast as they make suitable proficiency, and in the same manner as the whites. This, in our judgment, will remedy the evil complained of, and at the same time furnish the colored children in the primary departments better advantages than they can possibly have under the present management.      Very respectfully,
L. C. WASSON,
WM. SUMNER,
*Committee.*

On motion, action on that portion of the report which relates to the colored children was postponed, and the clerk was instructed to find out from other cities how they arranged as to their children.

At the meeting held June 7, 1880, the following proceedings were had, to wit:

On motion, that portion of the report of the committee on buildings and grounds relating to the colored children was taken up, and adopted.

EXHIBIT B.

OTTAWA, KANSAS, September 17, 1880.—Leslie Tinnon is assigned to the white school house, second grade.

WM. WHEELER, *Principal of Schools.*

EXHIBIT C.

SEPTEMBER 17, 1880.—*Elijah Tinnon, Esq., Ottawa—Dear Sir:* The orders of the board of education are, that all blacks below the grade of No. 7 shall be assigned to the white school house, or to the school taught by Mr. Rickett. Leslie is, in consequence of this order, assigned to that school.

Yours truly, WILLIAM WHEELER.

The defendants answered as follows:

"1st. They admit that the facts set forth in said petition are true.

"2d. Further answering, they say that the defendant, the board of education, directed. the children below the grade of room No. 7 to be assigned to a separate room under the power of general control and superintendence of the schools conferred upon them in article 11, chapter 92, of the General Statutes of Kansas, and they further allege that the number of children assigned to said separate room is so small that they can be satisfactorily accommodated and thoroughly taught in said room by one teacher. The teacher employed to teach in said room is entirely competent for such duty, and the educational facilities and advantages afforded to the scholars in said room are uniform with and fully equal in every respect to those enjoyed by the white children in rooms Nos. 1, 2, 3, 4, 5 and 6, in the main school building.

"3d. At the time that said action was taken establishing a separate school room for said colored school children, the number of children of school age in the city of Ottawa exceeded the accommodations afforded by the building in which for some years past the schools of the city have been kept. It was therefore determined by the board to provide for some of the children by using two small buildings belonging to the board of said city. One of said buildings stands two blocks distant from said main school building, and to this building some of the white children belonging to the primary grades were assigned. The other building is separated from the main school building by the width of the street only, and to this room the colored children aforesaid were assigned. Said room is properly finished, and furnished uniformly with the other rooms to which the white children are assigned.

"Wherefore, having fully answered, the defendants pray to be dismissed with their costs."

Trial at the January Term, 1881, of the district court, and judgment for the plaintiff. The defendants bring the case here.

*H. C. Mechem,* for plaintiffs in error:

1. The regulation complained of is fully authorized by the power of general control of the schools, which is vested in the board of education. (Comp. Laws 1879, ch. 92, §§ 151, 158.) Its duty is to maintain, with the funds provided for the purpose, a system of free public schools, from which it may at once be conceded that no child of proper age can be excluded, except for gross immorality, contagious disease, or similar reason. The controversy here turns entirely upon the decision of the question, What is an exclusion from the public schools? We contend that this rule is one of classification, not of exclusion, and therefore within the discretion of the board and beyond the reach of mandamus. (High on Ex. Remedies, § 24.) What is exclusion from the schools? or, to put it differently, What is the right which a child of school age has in Ottawa? Is it a right to attend school in a certain building or room, and enjoy the instruction of a certain teacher? Is it not rather the right to the facilities for obtaining knowledge which the public provides for those who live in the same community? It is not the right to dictate the management of the schools, the classification of pupils there, and the distribution of teachers, but the privilege of learning in these schools, subject to such rules and regulations as the board of education in its discretion may deem it prudent to make. The board of education, in this instance, has furnished a comfortable place and competent teachers for the children in its jurisdiction, without regard to the position in society, the wealth or color of their parents. All this is admitted; but the board has seen fit to direct that to certain of these rooms and teachers the white children of six primary grades shall go, and to a certain other room and to an equally competent teacher the colored children of these grades shall go. Where is the exclusion? Is it that *all* teachers and rooms are not equally accessible to them? They are not to the white children. Is it that *certain* rooms and teachers are not equally open to them? Neither are they to the white

children. In every large graded school, pupils of exactly the same qualifications are arbitrarily separated and placed in different rooms. Yet no one thinks of calling that exclusion. What facility or opportunity for education does the white child in Ottawa enjoy which his colored neighbor does not? None. The grievance is, not that they have not an equally comfortable room and an equally qualified instructor and similar studies, but that they are denied the pursuit of knowledge in the company of white children. If this companionship is an educational facility which the public is under obligation to furnish them, as it furnishes rooms and teachers, this writ was properly allowed; if not, it should have been refused. We claim that whatever the subtle and indeterminable influence may be which is exercised by the company of the white children with the colored, it is not one which the latter are entitled to demand as of right. It can only be claimed on the ground that the Caucasian youth is brighter and quicker than his dark-skinned brother, and that the contact would tend to sharpen and inspirit the latter. Suppose this is true, does it follow that we are ready to reorganize our school system and classify pupils on the basis of relative mental keenness and vigor? The intellectual difference is just as great between individual whites as it can be between the average intelligence in the white and colored races. So the man whose child is eager to learn and quick to acquire can insist that his boy shall be placed in a room with those only who are his equals intellectually, while the white man whose children do not pant for knowledge will insist with the same propriety that this claim is pressed here that his child shall have selected for his room-mates those who will help, by their emulation, to inspire him with love for the pursuit of knowledge. It is utterly impracticable to require that any such basis for classification shall be regarded by those who administer our educational trusts. The board has said in its discretion that it is best to educate the races separately. There may be a great diversity of opinion with reference to its action, but that will not justify interference with its action

by the courts. So long as *substantial rights* remain intact, the only remedy within the reach of those who criticise this action is to replace these officials in the legal way with those who will act differently. They are responsible for the exercise of their discretion to their masters the public, and to that tribunal complainants may freely go. The discretion with which a public functionary is vested is not forfeited because it happens to turn out that he actually has no discretion, (*i. e.*, judgment.) Mandamus does not lie to supply the lack of good judgment in public officials. Neither can it be invoked to uproot prejudice or reprove passion. It is only to be exercised where substantial rights have been unjustly and illegally denied to an individual. (9 Ohio St. 406; 19 id. 198; 48 Cal. 36; 5 Cush. 198; 48 Ind. 327; 3 Woods, 177.)

The definition of the term "exclude," in 17 Wall. 445, was adopted for that case because to decide otherwise was to hold the restriction in the charter of the railroad company to be absolutely meaningless. It is no authority upon the question at bar.

2. But it is argued that the classification upon the basis of color is within the inhibition of the fourteenth amendment to the constitution of the United States. Two of the paragraphs of that amendment cannot by any construction be applied to this case. This regulation does not deprive the relator of life, liberty or property without due process of law, nor does it deny to him the equal protection of the law. Does it come within the remaining clause: " No state shall make or enforce any law which shall abridge the privileges or immunities of a citizen of the United States"? That it is not an abridgment of any immunity or privilege, we believe to be well established by the decisions alluded to above. But we deny that this paragraph of the amendment has any application, either in spirit or letter, to the plaintiff's case. It is a guaranty only of those privileges and immunities which are enjoyed by virtue of *federal* citizenship, and was not intended to add any protection to the privileges and immunities enjoyed by a citizen of a state, as such. This is explicitly decided by the

supreme court of the United States in the *Slaughter-House Cases*. (16 Wall. 36, 74, 75.)

What are the privileges and immunities of a citizen of the United States? They are such as resulted from and were secured in the organization of the federal government. Is the right to enjoy such educational advantages as the state may provide among these? We think not. Some of these rights are enumerated in the opinion just referred to, as, the right of the citizen to come to the seat of government to assert any claim which he may have upon the government; to transact any business he may have with it; to seek its protection; to share its offices, and engage in administering its functions; free access to its seaports, sub-treasuries, land offices, and courts; the care and protection of the government over his life, liberty and property on the high seas or in foreign countries; to assemble peaceably, and petition for redress of grievances; the writ of *habeas corpus*. These will serve to indicate the particular class of rights covered by this paragraph. The privilege of being educated at the public expense is derived from the state. There is no federal guaranty of our common-school system. It is exclusively a creation of the state, and as such is under the control of the state. The government of the United States has no power under its fundamental law to interfere with the state's management of its schools, any more than it could interfere with the management by the state of its great benevolent institutions. The educational facilities which the plaintiff enjoys are his by the grace of the state solely, and for any supposed grievance in connection with them which would give him a right of action, the courts of the state are open to him. To these he must go, and by their judgment he must abide. The case of *Strauder v. West Virginia* has no application to the facts we are considering. There the plaintiff was "denied the equal protection of the laws of the state." The constitution and statutes of West Virginia guaranteed him a trial by a jury of his peers, impartially chosen. By making it impossible for his peers, who happened to be of his color, to be chosen on that jury, he *was* denied the equal pro-

tection of the law. This was the ground upon which the case was prosecuted and decided. It could not have been so held under the clause protecting the privileges and immunities of citizens of the United States, for trial by jury in the state courts is not guaranteed by the *federal* constitution, but *is* by *state* constitutions. The only decision in the federal courts upon this question is made in the case in 3 Woods, *supra*, where Mr. Justice Woods held that the fourteenth amendment does not apply to the educational privileges afforded by a state to its citizens. The same view of the scope of this paragraph was taken by the supreme court of California, and that of Ohio, in the cases cited, *supra*.

*John W. Deford*, for defendant in error:

Sections 151 and 158 of ch. 92, Comp. Laws of 1879, are all the laws of the state necessary to be cited to show the state policy in reference to the subject-matter of inquiry. These sections provide for a system of free schools, and in cities of the second class give to the boards of education plenary power over them. The boards can organize a system of graded schools, establish a high school, and exercise sole control over the schools and school property: *Provided, always,* (sec. 151, *supra*,) they maintain a system of *common* schools "*free to all children residing in such city,*" of proper ages. Now, under the order complained of, out of all the schools in Ottawa, *but one* is free to the African, or "*mixed-blooded*" children. Is this maintaining *common* schools, *free to all* the children of the city? It is absurd to say so.

It is alleged that the order of the school board prohibiting the colored children from attending the school where white children are taught, is in contravention of the true intent and meaning of the fourteenth amendment to the constitution of the United States, and is therefore void. And it is further contended, that as there is organized a system of free schools for all children of school age, all children have of right the privilege of enjoyment thereof, as well for the instruction to be obtained from the teachers as for the benefits to be ob-

tained from social intercourse and example set by those brought up in a more refined manner.

The question as to the effect of the fourteenth constitutional amendment upon the order of the school board, is of grave import. This provision of the constitution received an interpretation in the cases known as the *Slaughter-House Cases,* 16 Wall. 36, and also in the case of *Strauder v. West Virginia,* 10 Otto, 303.

In the first-mentioned case, Mr. Justice Bradley, in a dissenting opinion, uses this language: "A citizen of the United States has a perfect constitutional right to go to and reside in any state he chooses, and to claim citizenship therein, and an equality of rights with every other citizen; and the whole power of the nation is pledged to sustain him in that right. He is not bound to cringe to any superior, or to pray for any act of grace as a means of enjoying all the rights and privileges enjoyed by other citizens. . . . If a man be denied full equality before the law, he is denied one of the essential rights of citizenship as a citizen of the United States." Mr. Justice Miller, in delivering the opinion of the court, said: "We doubt very much whether any action of a state not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision."

In *Strauder v. West Virginia,* the following language was used by the court, speaking through Mr. Justice Strong: "It [the fourteenth amendment] ordains that no state shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States (evidently referring to the newly-made citizens, who, being citizens of the United States, are declared to be also citizens of the state in which they reside.) It ordains that no state shall deprive any person of life, liberty or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal

before the laws of the states, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race—the right to exemption from unfriendly legislation against them distinctively as colored, exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race."

In *Rld. Co. v. Brown*, 17 Wall. 445, the court held that in an enactment granting certain privileges to a railroad company, it was provided that no person shall be excluded from the cars on account of color; that this meant that persons of color should travel in the same cars that white ones did, and along with them in such cars, and that the enactment was not satisfied by the company's providing cars assigned exclusively to people of color, though they were as good as those which were assigned exclusively for white persons, and in fact were the very cars which were at certain times assigned exclusively to white persons; that discriminations on account of color must cease, and the colored and white race, in the use of cars, be placed on an equality.

In the case at bar, the school board of the city of Ottawa has enacted a rule of which the relator complains. It is a rule plainly discriminating against the relator on account of his race or color, pointing out himself and others of his class, by reason of their color, as not being eligible to school privileges with white children.

It is no answer to the proposition to say that white children are excluded from the African school room. It is evident as to the purpose of the rule. Under the construction which the supreme court of the United States has put upon the fourteenth amendment of the constitution, it is evident to every mind that the legislature of the state of Kansas had no

power to confer authority upon the school board of the city of Ottawa to make the order complained of. The rule itself is a violation of the rights conferred by the fourteenth amendment, and is inoperative and void. ( 24 Iowa, 226; 40 id. 518; 41 id. 689.)

*C. B. Mason*, in reply, for plaintiffs in error:

The argument of counsel for defendant in error presents an alternative: First, that under §§ 151 and 158, pp. 846–7, Comp. Laws 1879, the action of the board of education in excluding from a particular school room the scholar on the ground that he is a person of African descent, is illegal; second, if it is authorized and lawful under those provisions, it is nevertheless illegal, because in violation of the fourteenth amendment to the federal constitution.

In reply, a brief commentary on the laws and authorities cited by counsel is submitted, beginning with reference to the federal amendment, and the authorities which he claims to be in point.

The powers granted by the people to the federal government are to be construed on the theory that all powers not expressly or incidentally conferred by the people are prohibited, and being the converse of the theory of construction applied to state constitutions. On the one theory, the prohibition is general; but on the other theory, the grant of power is general, and the prohibition is special. The thirteenth, fourteenth and fifteenth amendments, in most of their provisions, belong to that class of enumerated powers of the general government known as prohibitions to the states, and which the federal government has the power to enforce; but in the construction to be given of the supervisory control to be exercised by the United States, the vigilant federal judiciary expresses the conception which it entertains when called upon to construe these amendments, that it is the duty of the general government to abstain from claiming powers not expressly granted.

We all know that the adoption of these amendments had

its foundation in the necessity of rectifying the political discriminations which existed, and which were inharmonious with the cardinal principle and theory of free government. And viewing the apparent scope of the first section of the fourteenth amendment, it is singular that any necessity existed for the adoption of the fifteenth amendment, as the unlearned can scarcely conceive a broader and more comprehensive statement of equal rights. But the jealousy of the people as against the possible encroachment of federal power, had given birth to the ninth and tenth amendments, and to such salutary rule of construction by the judiciary, that the adoption of the fifteenth amendment was vitally necessary to remedy the evil still then existing; and in this amendment, for the first time the term "color" appears in the federal constitution. Bearing in mind the prevalence of such rule of construction, the history and intention of congress and the legislature, and of the people in submitting and adopting these amendments, is it the lamentable fact claimed by counsel that under the fourteenth amendment, no school board has the right, under the circumstances of the agreed facts in this case, to make the regulation complained of? In the authority from which counsel cites a paragraph only in his support, (16 Wall. 36,) the court, in the opinion by Mr. Justice Miller, says: "Was it the purpose of the fourteenth amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges and immunities of *citizens of the United States,* to transfer the security and protection of all the civil rights which we have mentioned from the states to the federal government? And where it is declared that congress shall have the power to enforce that article, was it intended to bring within the power of congress the entire domain of civil rights heretofore exclusively belonging to the States?" And this is answered as follows: . . . "We are convinced that no such results were intended by the congress which proposed these amendments, nor by the legislatures of the states which ratified them."

The whole opinion of Mr. Justice Miller is as able and

philosophic as may ever be rendered concerning the fourteenth amendment; and it is evident that the power of the general government will never be extended by the judiciary to condemn any laws of a state so long as equal advantages and equal protection are available under the law, and not denied, whether on account of color or any other difference.

The paragraph referred to as cited by counsel from the opinion of Mr. Justice Miller, "We doubt very much whether any action of a state not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision," is made by the court with reference to the clause, "No state shall deny to any person the equal protection of the laws." But the court also, in regard to this clause, says: "In the light of the history of these amendments, and the pervading purpose of them which we have already discussed, it is not difficult to give a meaning to this clause. The existence of laws in the states where the newly-emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden." Now it cannot be truthfully said that any such laws exist in the state of Kansas, nor that any such injustice, or hardship, or inequality, or discrimination, appears in the agreed facts of this case, as is contemplated by the fourteenth amendment.

The decision of the circuit judge lately elevated to the supreme bench is in our opinion conclusive, and the only one directly in point. (3 Woods, 177.) Rendered subsequently to all the decisions cited by counsel, it is hardly to be presumed that the learned judge was not familiar with the decisions of the federal courts when deciding that educational privileges are matters exclusively within the domain of the state, and not the rights, privileges, immunities and protection intended to be enforced by the federal government by virtue of the fourteenth amendment.

The case of *Strauder v. West Virginia* (10 Otto, 303) is not a case parallel to that of the relator. The circumstances

there make a palpable violation of the protection of the laws a denial of the equal protection of the laws; a refusal of the rights, privileges and immunities of a citizen, *i. e.*, the right to a trial by a jury of his peers; a discrimination against the negroes as a class, in denying also the rights as jurors, as the rights of the defendant, and make one class of trial for the white man and another kind for the black man. That decision only declares that the law in West Virginia was not the same for the black as for the white, for it was in effect a denial of a trial by jury, such as the constitution and the laws intend.

Neither the defendant nor his race, under the facts in the Strauder case, had a possible or available chance of the equal protection of the laws. Were educational privileges embraced within the provisions of the amendment, there would in our opinion be a wide difference between that case and the one of the relator.

At first sight, the language of the case of *Rld. Co. v. Brown*, 17 Wall. 445, seems to be a sermon on the gospel of social equality, to the gratification of the most sanguine colored aspirant for Caucasian privileges; and that, with the *Slaughter-House Cases*, and *Bertonneau v. School Directors*, 3 Woods, 177, the federal decisions have shown with admirable skill, how

> "To veer and tack and steer a cause
> Against the weather-gage of laws."

But after a careful perusal of the opinion and consideration of the facts of the case, we are at no loss to understand the duty of the court in construing a grant of power strictly against a corporation having special privileges. Such privileges were asked and accepted, coupled with a proviso that no person should be excluded from its cars on account of color, and the court, without any reference to the fourteenth amendment, but construing the particular enactment of congress in granting the charter of the powers of the railroad company, used the language cited by counsel declaring that discriminations on its cars on account of color must cease — not because of the fourteenth amendment, but because of the intention of

the enactment, and by reason of the rule of construction in such cases.

The sum and the substance of that decision is: That if a railroad company accept a charter, it will be construed most strongly against it, and if it is provided that no person shall be excluded from the cars on account of color, then the same sleeping cars and appurtenances are alike the privileges under the charter to the black and white. If the courts, as in the case of *Rld. Co. v. Brown,* are to take into consideration the intention of the law-makers, we may safely conclude that neither congress, the legislature, nor the people, at the time of the adoption of the fourteenth amendment, had in view the education of blacks and whites in the same school room; and it may safely be denied that educational privileges were the questions then under consideration. Questions of association are different questions from the political rights and protection aimed at, and in which the government has the right to demand an equality. Such political rights, meant to be conferred by the fourteenth amendment, are the material, substantial equality before the law, to be enjoyed by all citizens regardless of discrimination on account of any differences; but not the remote, imaginary and speculative rights claimed by the relator in this case. He is not denied any rights whatever; his opportunities for an education are admitted to be equal with the best, and his wrongs are only that his taste is violated. It is a true, though an unpopular declaration, that courts will not interfere to regulate such fancies of any individual, so long as *De gustibus non est disputandum* remains the fact.

The opinion of the court was delivered by

VALENTINE, J.: This is an action of mandamus, brought by Leslie Tinnon, a colored boy of school age, by his next friend, Elijah Tinnon, to compel the board of education of the city of Ottawa, and William Wheeler, the principal of the public schools of said city, to admit the plaintiff to attend one of such public schools. A trial was had in the court be-

low by the court without a jury, and judgment was rendered in favor of the plaintiff and against the defendants, and a peremptory writ of mandamus was ordered; to all of which the defendants below excepted, and now bring the case to this court for review.

In the court below, the pleadings were so framed and admissions were so made that the only question presented to the court below for decision was, whether the board of education of a city of the second class has the power to establish separate schools for white and colored children, and to exclude colored children from the schools established for white children for no other reason than that they are colored children. As before stated, the court below decided that the board of education has no such power. The statutes of this state having application to this question, read as follows:

"SEC. 2. In each city governed by this act there shall be established and maintained a system of free common schools, which shall be kept open not less than three nor more than ten months in any one year, and shall be free to all children residing in such city between the ages of five and twenty-one years. But the board of education may, where school-room accommodations are insufficient, exclude for the time being children between the ages of five and seven years."

"SEC. 9. The board of education shall have power to elect their own officers, except the treasurer; to make their own rules and regulations, subject to the provisions of this article; to organize and maintain a system of graded schools; to establish a high school whenever in their opinion the educational interests of the city demand the same; and to exercise the sole control over the schools and school property of the city."

These statutes were passed in 1876. (Laws of 1876, ch. 122, art. 11, §§ 2, 9; Comp. Laws of 1879, pp. 846, 847.)

For the purposes of this case we shall assume that the legislature has the power to authorize the board of education of any city or the officers of any school district to establish separate schools for the education of white and colored children, and to exclude the colored children from the white schools, notwithstanding the fourteenth amendment to the constitution of the United States; and there are decisions in some of the

states which sustain such authority. (*The State v. McCann*, 21 Ohio St. 198; *Cory v. Carter*, 48 Ind., 327; *Ward v. Flood*, 48 Cal. 36; *Bertonneau v. The Directors of the City Schools*, 3 Woods, 177.) But still this power of the legislature may be doubted. (*Strauder v. West Virginia*, 100 U. S., 303. See also *Ex parte Virginia*, 100 U. S. 339; *Slaughter-House Cases*, 16 Wall. 36; *Neal v. State of Delaware*, [U. S. Sup. Court, May 1881,] 23 Alb. L. J. 466; 12 Cent. L. J. 514.) The fourteenth amendment provides among other things, as follows:

"SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

In the case of *Strauder v. West Virginia*, 100 U. S., p. 307, the court uses the following language:

"It [the fourteenth amendment to the constitution of the United States] ordains that no state shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States, (evidently referring to the newly-made citizens, who, being citizens of the United States, are declared to be also citizens of the state in which they reside.) It ordains that no state shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states; and in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race — the right to exemption from unfriendly legislation against them distinctively as colored — exemption from legal discriminations, implying inferiority in civil society, lessen-

ing the security of their enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race."

The question whether the legislatures of states have the power to pass laws making distinctions between white and colored citizens, and the extent of such power, if it exists, is a question which can finally be determined only by the supreme court of the United States; and hence we pass this question, and 'proceed to the next, over which we have more complete jurisdiction.

Has the legislature of the state of Kansas given, or attempted to give, to the boards of education of cities of the second class, the power to establish separate schools for the education of white and colored children, and to exclude from the schools established for white children all colored children, for no other reason than that they are colored children? *Prima facie,* this question should be answered in the negative. The tendency of the times is, and has been for several years, to abolish all distinctions on account of race, or color, or previous condition of servitude, and to make all persons absolutely equal before the law. Therefore, unless it appears clear beyond all question that the legislature intended to authorize such distinctions to be made, we should not hold that any such authority has been given. And we certainly should not expect to find that the legislature had given any such authority during the centennial year of 1876, when the minds of all men were inclined to adopt the most cosmopolitan views of human rights, and not to adopt any narrow or contracted views founded merely upon race, or color, or clan, or kinship. It is true that in cities of the first class, which included up to within a year past only the city of Leavenworth, the power to make such distinctions existed. But this power has always existed in the city of Leavenworth, from its earliest territorial days down to the present time, and was given to that city at first as a mere matter of local concern, and at a time when the prevailing opinions of men were very different from the prevailing opinions of men at the present day.

The first act passed by the *state* legislature giving such power to the city of Leavenworth, will be found in the Compiled Laws of 1862, pp. 395, 396, §§ 18, 19; and the power was then *expressly* given to such city, and was not left for mere inference or conjecture.   See also Compiled Laws of 1879, p. 843, § 142.   This last-mentioned act will now apply to two other cities, as well as to the city of Leavenworth, and the power is *expressly* given.

The tendency of the present age is not to make any distinctions with regard to school children, except to classify them with reference to their studies and place them in the classes in which they properly belong.   All kinds of children are usually allowed to go to the same schools, and all kinds of children are usually placed in the same classes.   Boys and girls are allowed to go not only to the same schools, but are also placed in the same classes, and even colleges are now opening their doors for the education of both sexes; and is it not better that this should be so?   Is it not better for the grand aggregate of human society, as well as for individuals, that all children should mingle together and learn to know each other?   At the common schools, where both sexes and all kinds of children mingle together, we have the great world in miniature; there they may learn human nature in all its phases, with all its emotions, passions and feelings, its loves and hates, its hopes and fears, its impulses and sensibilities; there they may learn the secret springs of human actions, and the attractions and repulsions, which lead with irresistible force to particular lines of conduct.   But on the other hand, persons by isolation may become strangers even in their own country; and by being strangers, will be of but little benefit either to themselves or to society.   As a rule, people cannot afford to be ignorant of the society which surrounds them; and as all kinds of people must live together in the same society, it would seem to be better that all should be taught in the same schools.

The supreme court of Iowa seems to have taken the same view of this subject that we have taken — that is, that unless

the legislature has *clearly* conferred power upon the school boards to establish separate schools for the education of white and colored children, no such power has been conferred. Under a statute which reads, "in each sub-district there shall be taught one or more schools for the education of youth between the ages of five and twenty-one years," the supreme court of Iowa held that the school board could not establish separate schools for the education of white and colored children, and could not exclude colored children from attending schools established for the white children alone. (Sec. 12, ch. 172, Laws of Iowa of 1862, as amended by § 3, ch. 143, Laws of Iowa of 1866; *Clark v. The Board, &c.*, 24 Iowa, 266; *Smith v. The Directors, &c.*, 40 Iowa, 518; *Dove v. Independent School District*, 41 Iowa, 639.)

Now we do not think that the legislature of Kansas has *clearly* conferred power upon the school boards of cities of the second class to establish separate schools for the education of white and colored children. We do not think that the legislature has even been silent upon the subject. But, by the clearest implication, if not in express terms, it has prohibited the boards from establishing any such schools. Said §§ 2 and 9 of the Laws of Kansas of 1876 provide for a system of free schools in cities of the second class, giving the board of education plenary power over them. The board can organize a system of graded schools, establish a high school, and exercise sole control over the schools and school property: provided always (under § 2), that it "maintains a system of free common schools," "free to all children residing in such city," of proper ages. Now, if only one school out of all the schools of a city of the second class is free for colored children to attend, is that maintaining *common* schools, *free to all the children of the city?* In the case of *Railroad Co. v. Brown*, 17 Wall. 446, in which the supreme court of the United States construed an act of congress granting certain privileges to a railroad company, and also enacting that "no person shall be excluded from the cars on account of color," the court "*held*, that this meant that persons of color

should travel in the same cars that white ones did, and along with them in such cars; and that the enactment was not satisfied by the company's providing cars assigned exclusively to people of color, though they were as good as those which they assigned exclusively for white persons, and in fact the very cars which were, at certain times, assigned exclusively to white persons." That is, under this decision, railroad cars are not *free* to a person who is excluded from all but one of them; and, on the same principle, schools are not *free* to a person who is excluded from all but one of them.

We suppose that the board of education of a city of the second class may grade the schools in such city, and then require that all children be placed in their proper grades. This is for the interest of education; and the statute expressly authorizes it. We also suppose that the board of education may divide the city territorially into districts, building school houses in each district, and may then require that children shall attend school only in their own district. This would also be in the interest of education. Generally such a thing would be founded upon convenience, and sometimes upon necessity. But the power to divide a city territorially into districts does not include or prove the power to divide the city according to race, color, nationality or descent. In the case of *School District v. Aldrich*, 13 N. H. 139, it is held that "a division of a town into school districts must be a territorial division, and not one merely by a designation of the inhabitants or householders." And what good reason can exist for separating two children, living in the same house, equally intelligent, and equally advanced in their studies, and sending one, because he or she is black, to a school house in a remote part of the city, past several school houses nearer his or her home, while the other child is permitted, because he or she is white, to go to a school within the distance of a block? No good reason can be given for such a thing, and the legislature has not authorized or attempted to authorize it to be done. It has been suggested that the board of educa-

tion may establish separate schools for males and females; and, therefore, that it may establish separate schools for white and colored children. Now the premise is not admitted, and the conclusion is a *non sequitur*. It is not admitted that the legislature has the power to authorize the board to establish separate schools for males and females, (Const., art. 2, § 23;) nor is it admitted that the legislature has even attempted to do so; and besides, even if the legislature had the power to authorize schools for males and females, and had attempted to exercise it, still it would not even then follow that the board of education could establish separate schools for white and colored children. There are greater differences existing between males and females of the same race, and occupying the same condition in life, except as to sex, than there are between any two males, or any two females of different races, who reside in Kansas, and whose conditions are substantially equal, except as to race. This is recognized by the fact that male citizens of all races are allowed to vote, while no female citizen of any race is allowed to vote. There are physiological differences, and differences in wants and needs, and modes of life, existing between males and females of the same race, which do not exist between males of different races, or females of different races. Hence, the power to establish separate schools for males and females, even if it were admitted, would not either include or prove the power to establish separate schools for children of different races; and especially it would not include or prove the power to establish separate schools for children of African descent. If the board has the power, because of race, to establish separate schools for children of African descent, then the board has the power to establish separate schools for persons of Irish descent or German descent; and if it has the power, because of color, to establish separate schools for black children, then it has the power to establish separate schools for red-headed children and blondes. We do not think that the board has any such power. We have conceded, for the purposes of this case,

that the legislature has the authority to confer such power upon school boards; but in our opinion the legislature has not exercised or attempted to exercise any such authority.

This decision is not in conflict with any decision that we are aware of; but it is supported by the decisions in Iowa. The decisions referred to by the counsel for plaintiffs in error, defendants below, are either all very old, and rendered before the war, or are founded upon statutes expressly authorizing separate schools for white and colored children; while in this state, our statutes have been recently enacted, and as we construe them they do not authorize the establishment of any such separate schools; and hence, the decisions referred to by counsel have no application to this case. It must be remembered that unless some statute can be found authorizing the establishment of separate schools for colored children, that no such authority exists; and we have been unable to find any such statute, and none has been pointed out to us.

The judgment of the court below, we think is correct, and therefore it will be affirmed.

HORTON, C. J., concurring.

BREWER, J., *dissenting:* I am unable to concur with my associates in the opinion filed in this case, and will state briefly the grounds of my dissent.

The arguments advanced by my brother VALENTINE seem to me more properly arguments for the consideration of the legislature, as to the wisdom and policy of school legislation, than as correctly expounding the legislation which already exists. The question is, not whether white and colored children ought to be educated together, but what power of classification and control has been given by the legislature to boards of education, in cities of the second class.

I dissent entirely from the suggestion that under the fourteenth amendment of the federal constitution, the state has no power to provide for separate schools for white and colored children. I think, notwithstanding such amendment, each state has the power to classify the school children by color,

sex, or otherwise, as to its legislature shall seem wisest and best. And to that view I think the general current of authority, both in state and federal courts, tends.

Believing that the single question is one of the power granted, I turn to the statutes to ascertain the extent of that power. Section 158, chapter 92, Compiled Laws of 1879, provides that the board of education shall exercise sole control over the schools and school property of the city. If this stood alone, there could be but little doubt of its full power of classification; but section 151 provides that there shall be established and maintained a system of free common schools, "which shall be free to all children residing in such city." There is also given authority to establish graded schools. From these provisions it is argued that the limit of classification is scholarship. Graded schools may be established, but when established any scholar of any grade is free to attend any school of that grade in the city. Any classification by color is said to be a trespass on the freedom of the schools. It does not seem to me that the opinion of the majority of the court is consistent with itself; it concedes that the board of education may divide the city, territorially, into districts, and require the children in one district to attend the schools of that district, and it suggests that possibly a classification by sex might be allowed; but no section of the statute is pointed out which recognizes any such classification.

If classification by color is prohibited by that clause which says that all schools shall be free to all children residing in such city, I cannot see why classification by sex, as well as by district, is not equally prohibited. Classification by district may be more reasonable and in the interest of education, while classification by color may be unreasonable and deserve condemnation; but the question before us is not one of policy, but one of power. And when the legislature provides that schools shall be free to all children of the city, it means that each child shall select for itself what school, anywhere in the city, of its grade of scholarship, it shall attend; or else that the board of education, in the exercise of its sole control,

may classify the scholars by territory, sex, or color, as it shall deem wisest and best, providing only that to each child is secured equal school advantages.  The latter, I think, is the true construction.  The constitution, art. 2, § 23, reads: "The legislature, in providing for the formation and regulation of schools, shall make no distinction between the rights of males and females."  I have never understood and do not yet understand that that section compels coëducation of the sexes.  All I understand that to mean is, that equal advantages be secured to the boys and to the girls, leaving the matter of the separate or coëducation to be settled by the wisdom of the legislature.  In like manner I think free schools mean equal school advantages to every child, leaving questions of classification by territory, sex, or color, to be determined by the wisdom of the local authorities.  For instance, I do not think a child in North Lawrence can insist upon going to a school in South Lawrence simply because it dislikes the teacher in North Lawrence; I think the board of education in the city of Lawrence has the power to limit its attendance to the schools of North Lawrence, notwithstanding the guaranty of the freedom of the public schools.  I think likewise, that a girl in Lawrence has not the right to demand admission to a school in that city attended by boys only, when a school of like advantages and attended by girls only is, by order of the board of education, open to her.  The same rule also, in my judgment, controls in reference to color as to sex, or territory. Freedom of the schools means, that the schools as a whole shall be free, and not that each school shall be free to everybody.  Suppose the children all wanted to go to one school, and the parents all joined in that desire: can they overflow the one room and leave the other rooms vacant?  Has the board no control?  Can it compel no classification?  And if it has the right to classify, whose judgment controls as to such classification, that of the board of education elected by the community, or that of the courts?  I think the former.

I see no half-way place; under the power of sole control the board of education has the power to classify, as to it shall

seem best, so far as is not in terms prohibited; or else under the provision for freedom of schools each child may determine for itself what school of its grade of scholarship in the city it will attend, irrespective of any question of territory, sex, or color. Believing the former the true interpretation of the statute, I am compelled to dissent from the opinion of the court. In this connection I may also refer to the dissenting opinion of Mr. Justice Wright, of the supreme court of Iowa, 24 Iowa, 266, as expressing my views.