IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,796

STATE OF KANSAS,
*Appellee*,

v.

N.R.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Mandatory lifetime postrelease registration under the Kansas Offender Registration Act, K.S.A. 2020 Supp. 22-4901 et seq., as applied to the juvenile sex offender in this case, does not constitute punishment for purposes of applying provisions of the Ex Post Facto Clause of the United States Constitution.

2.

Mandatory lifetime postrelease registration under the Kansas Offender Registration Act, K.S.A. 2020 Supp. 22-4901 et seq., as applied to the juvenile sex offender in this case, does not constitute punishment for purposes of applying provisions of the Eighth Amendment of the United States Constitution and section 9 of the Kansas Constitution Bill of Rights.

3.

Mandatory lifetime postrelease registration under the Kansas Offender Registration Act, K.S.A. 2020 Supp. 22-4901 et seq., as applied to the juvenile sex offender in this case, does not infringe on the constitutional rights guaranteed under sections 1 and 18 of the Kansas Constitution Bill of Rights.

Review of the judgment of the Court of Appeals in 57 Kan. App. 2d 298, 451 P.3d 877 (2019). Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed September 17, 2021. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rick A. Kittel*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Jennifer Harper*, assistant district attorney, argued the cause, and *Thomas R. Stanton*, district attorney, *Keith E. Schroeder*, former district attorney, and *Derek Schmidt*, attorney general, were with her on the briefs for appellee.

PER CURIAM: N.R. pled guilty to rape and was adjudicated a juvenile offender. As a result of this adjudication, he was required to register as a sex offender for five years under the Kansas Offender Registration Act (KORA). See K.S.A. 2006 Supp. 22-4906. Later amendments to KORA required N.R. to register for life. See K.S.A. 2020 Supp. 22-4906(d)(1), (h).

After failing to register in 2016, the State charged N.R. with violating KORA. N.R. moved to dismiss the charge, arguing that the lifetime registration requirements violated federal and state constitutional provisions against cruel and unusual punishment and the Ex Post Facto Clause of the United States Constitution. The district court denied the motion. The Court of Appeals affirmed, finding the lifetime registration requirements are not punishment as applied to N.R. and therefore do not trigger any of the constitutional provisions identified. On review, N.R. challenges the panel's holding. For the reasons stated below, we affirm.

FACTS

In August 2006, N.R. pled guilty to and was adjudicated of rape, a level 1 person felony. N.R. was 14 years old at the time he committed the offense. The magistrate judge sentenced N.R. to 24 months in a juvenile correctional facility but placed N.R. on 24 months' probation with community corrections. In November 2006, the magistrate judge additionally ordered N.R. to register "locally only, as a sex offender." N.R. was not required at that time to publicly register statewide or nationally. Although the magistrate judge's order did not specify how long N.R. would have to register locally, the statute in effect at the time of the adjudication—K.S.A. 2006 Supp. 22-4906(h)(1)—required N.R. to register for five years from the date of his adjudication.

In July 2011, just before N.R.'s registration period was about to expire, the Kansas Legislature substantially amended KORA. As a result of these amendments, N.R. was required to register for life. See K.S.A. 2011 Supp. 22-4906(h).

In June 2017, the State charged N.R. with four counts of failing to register pursuant to KORA. The complaint later was amended down to two counts. One count stemmed from an incident in August 2016, when N.R. was removed from his transitional housing program. N.R. was supposed to report in person to the Reno County Sheriff's Office within three days of his removal from the program because it constituted a change of residential address. He failed to do so. As for the other count, N.R. failed to report in person to the Reno County Sheriff's Office during the month of September 2016 as required. Because he had a previous registration violation, both of the 2016 charges were scored as level 5 person felonies.

Before trial, N.R. filed a motion to dismiss the case. Relevant here, N.R. argued KORA's mandatory lifetime registration requirements for juvenile sex offenders violate

federal and state constitutional provisions against cruel and unusual punishment and the Ex Post Facto Clause of the United States Constitution. The State opposed the motion, claiming dismissal was inappropriate based on this court's decision in *State v. Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127 (2016), which held that KORA's lifetime registration requirements for adult offenders are not punitive and therefore are not subject to a punishment or ex post facto constitutional analysis.

At the hearing on the motion to dismiss, N.R. introduced two affidavits to support his motion:  one from his fiancée and one from himself. As discussed further below, there is some dispute as to whether these affidavits were admitted into evidence. Each affidavit purportedly explained the various ways in which KORA's lifetime registration requirements specifically act as a punishment for N.R., his fiancée, and his young child. Both affidavits described how difficult it was for them to find and secure housing due to N.R.'s status as a sex offender; how hard it was for N.R. to find and maintain employment; how the $20 reporting fee imposed additional financial strain on the family because they already were a low-income household; how N.R. continued to struggle with his sobriety because treatment facilities and sober living houses across Kansas would turn him away due to his status, which led to homelessness and seeking shelter in drug houses; how neighbors and community members ostracized N.R. and his family when those individuals learned of his status, including two occasions where N.R. was threatened at gunpoint; how N.R. and his fiancée feared for their child's safety; how N.R. was concerned about not being able to participate in his child's school activities due to his status; how N.R. suffered from depression as a result of the lifetime registration requirements; and how N.R. attempted suicide as a result of his depression. The State reiterated the arguments from its response brief. After considering counsel's arguments, the district court denied N.R.'s motion to dismiss based on this court's decision in *Petersen-Beard* holding that KORA lifetime registration requirements for adult offenders are not punitive.

The matter proceeded to a bench trial on stipulated facts. The district court ultimately found N.R. guilty and convicted him on both amended counts. The court sentenced him to 49 months in prison but granted N.R.'s request for a downward dispositional departure and ordered him to serve 36 months' probation with community corrections. N.R. timely appealed his conviction and sentence.

A panel of the Court of Appeals affirmed the district court's decision to deny the motion to dismiss, holding that KORA's lifetime registration requirements as applied to N.R. do not constitute punishment and therefore do not violate state and federal cruel and unusual punishment provisions or federal ex post facto provisions in N.R.'s case. See *State v. N.R.*, 57 Kan. App. 2d 298, Syl. ¶¶ 2-4, 302-03, 308-10, 451 P.3d 877 (2019) (relying on *State v. Rocheleau*, 307 Kan. 761, 765, 415 P.3d 422 [2018]; *State v. Marinelli*, 307 Kan. 768, 786, 415 P.3d 405 [2018]; *State v. Reed*, 306 Kan. 899, 904, 399 P.3d 865 [2017]; *Petersen-Beard*, 304 Kan. at 209).

N.R. timely petitioned for review challenging the panel's constitutional findings.

ANALYSIS

N.R. challenges the constitutionality of KORA's mandatory lifetime registration requirements as applied to him:  a 14-year-old juvenile who committed a triggering offense under KORA that now requires him to register as a sex offender for the rest of his life. He makes no specific argument in his petition for review or in his supplemental brief that KORA as applied generally to juvenile sex offenders is punitive for the purposes of accessing certain constitutional protections. Instead, N.R. claims that KORA's mandatory lifetime registration requirements as applied to the facts of his particular case constitute punishment that violates the federal Ex Post Facto Clause, violates the prohibition against

5

cruel and unusual punishment under the Eighth Amendment of the United States Constitution and section 9 of the Kansas Constitution Bill of Rights, and—for the first time on review—infringes on the constitutional rights guaranteed under sections 1 and 18 of the Kansas Constitution Bill of Rights.

The constitutionality of a statute is a question of law over which we exercise unlimited review. This court presumes that statutes are constitutional and must resolve all doubts in favor of a statute's validity. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

N.R. acknowledges that his constitutional ex post facto and cruel and unusual punishment challenges are viable only if we find the lifetime registration requirements are punishment as applied to him. Given this initial hurdle, we begin our discussion with a brief review of the existing caselaw on the underlying issue of punishment.

*Relevant caselaw*

Both the United States Supreme Court and this court generally have held, without reference to age, that mandatory lifetime sex offender registration is not punishment. In 2003, the United States Supreme Court applied the intent-effects test to decide whether registration requirements under the Alaska Sex Offender Registration Act (ASORA) constituted punishment for ex post facto purposes. *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (citing *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S. Ct. 2072, 138 L. Ed. 2d 501 [1997]). Under the intent-effects test, courts first determine whether the Legislature intended the statute to establish a civil proceeding. *Smith*, 538 U.S. at 92. If the Legislature intended to impose punishment, the inquiry ends, and the provision is deemed an ex post facto law. If, however, the Legislature's intent is nonpunitive, courts must go on to determine whether the statutory scheme is so punitive,

6

either in purpose or effect, that it negates the Legislature's civil intent. In making this determination, "'"only the clearest proof"' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" 538 U.S. at 92 (quoting *Hudson v. United States,* 522 U.S. 93, 100, 118 S. Ct. 488, 139 L. Ed. 2d 450 [1997]).

As noted above, the United States Supreme Court in *Smith* ultimately held ASORA was nonpunitive, and therefore, its retroactive application did not violate the Ex Post Facto Clause. *Smith*, 538 U.S. at 96, 105-06. The Court first concluded that the Alaska Legislature's intent "was to create a civil, nonpunitive regime." 538 U.S. at 96. The Court then analyzed the effects of ASORA using the seven-factor test of *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). In this test, courts must consider

> "the degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to the identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a crime." *Petersen-Beard*, 304 Kan. at 198 (citing *Mendoza-Martinez*, 372 U.S. at 168).

The *Smith* Court explained that the first five factors are the most relevant, while the remaining two are to be given "little weight." 538 U.S. at 105. The relevant factors are "'useful guideposts'" that are "'neither exhaustive nor dispositive'" for purposes of examining the entire statutory scheme to determine its punitive effect. 538 U.S. at 97. After reviewing the relevant *Mendoza-Martinez* factors, the *Smith* Court determined that ASORA's registration and notification requirements were not sufficiently punitive to overcome the nonpunitive legislative intent. As a result, the Court held that ASORA's

7

retroactive application did not violate the Ex Post Facto Clause of the United States Constitution. *Smith*, 538 U.S. at 105-06.

As both parties acknowledge, this court addressed the punitive nature of KORA in four opinions filed on the same day in 2016. In three of the opinions, a majority of the court held that KORA, as amended in 2011, was punitive in effect and that its retroactive application to any sex offender who committed a registerable offense before July 1, 2011, violated the Ex Post Facto Clause. *Doe v. Thompson*, 304 Kan. 291, 327-28, 373 P.3d 750 (2016); *State v. Redmond*, 304 Kan. 283, 289-90, 371 P.3d 900 (2016); and *State v. Buser*, 304 Kan. 181, 190, 371 P.3d 886 (2016).

The fourth opinion, *Petersen-Beard*, considered whether KORA as amended in 2011 constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. To resolve this issue, the majority performed a traditional ex post facto analysis because the first step of an Eighth Amendment inquiry is to determine whether the practice at issue constitutes punishment. 304 Kan. at 196. A different majority—due to a change in the court's composition since *Thompson*, *Redmond*, and *Buser* were argued—ultimately ruled that KORA was nonpunitive. The majority first found that the Legislature did not intend for KORA's sex offender registration scheme to be punitive. 304 Kan. at 195. The majority then analyzed the *Mendoza-Martinez* factors and ultimately found the burdens KORA's registration requirements imposed were not so onerous as to constitute punishment. Specifically, the majority found public dissemination of registration information does not rise to the level of public shaming, does not impose an affirmative disability or restraint, are not excessive, and are rationally connected to a nonpunitive purpose. 304 Kan. at 198-209. In so holding, the majority overruled *Thompson*, *Redmond*, and *Buser*, adopting the reasoning behind the dissent in *Thompson* "in toto" and "quot[ing] liberally" from it in reaching its decision. 304 Kan. at 197-209. This same majority later "explicitly

8

extend[ed] the holding of *Petersen-Beard* to apply to ex post facto challenges." *Reed*, 306 Kan. at 904.

This is the current state of the law. Both the United States Supreme Court and the most recent majority of this court have held that mandatory sex offender registration is not punishment. Because the cases do not mention the age of the offender as a factor in the analysis, however, we now turn to N.R.'s attempts to distinguish *Smith* and *Petersen-Beard* based on his juvenile status at the time of his offense.

*Affidavits*

In articulating his as-applied challenge, N.R. relies on specific facts set out in the two affidavits he introduced at the motion to dismiss hearing. As noted above, there is an issue regarding whether N.R. can rely on those facts to support his constitutional challenges. Specifically, the State argues he cannot rely on those affidavits because they were never formally admitted into evidence at the motion to dismiss hearing. Because he cannot rely on those affidavits, the State asserts that N.R.'s constitutional challenges necessarily fail. This argument persuaded the Court of Appeals panel, and it ruled that because the affidavits were not formally admitted into evidence at the motion to dismiss hearing or the bench trial, it could not consider them. *N.R.*, 57 Kan. App. 2d at 307 (citing *In re Estate of Watson*, 21 Kan. App. 2d 133, 137, 896 P.2d 401 [1995]).

An appellate court generally cannot consider evidence that was not presented at the district court level. *Volt Delta Res., Inc. v. Devine*, 241 Kan. 775, 782, 740 P.2d 1089 (1987) ("Evidence not presented to the trial court will not be considered for the first time on appeal."). However, we previously have found affidavits that were not formally admitted into evidence may be considered for the first time on appeal. This is especially true if the affidavit was attached to a relevant motion that was argued before the district

court, presented to the district court and referred to at oral argument, and at least somewhat considered by the district court in making a ruling on the relevant motion. See *Haddock v. State*, 282 Kan. 475, 492, 146 P.3d 187 (2006).

N.R.'s affidavit and his fiancée's affidavit were not attached as exhibits to N.R.'s original motion to dismiss. But his counsel presented both affidavits to the district court at the motion to dismiss hearing and highlighted specific facts from them when presenting oral argument on the merits of the motion. In presenting the affidavits to the court, counsel explained that they were signed and notarized and that she wished to label them as exhibits and present them as evidence. She then asked to approach the bench, and the court granted counsel's request but provided no indication as to whether the affidavits were admitted. The State never objected to the presentation of the affidavits or to counsel's remarks about them. The district court ultimately denied the motion to dismiss on legal grounds: that it was bound to follow the Legislature's directives and Kansas Supreme Court precedent. Because it relied on legal grounds, the district court did not make any factual findings regarding the affidavits or address their substance.

Given this background, and the fact that it appears the district court's decision *not* to make factual findings was based on its resolution of the issue presented as a matter of law, we will consider the affidavits, if necessary. See *Haddock*, 282 Kan. at 492.

*Punishment*

Under the two-part "intent-effects" test, N.R. concedes the Legislature intended KORA to be a regulatory and nonpunitive statutory scheme. Under step two of the test, however, he argues that the effects of the law are punitive as applied to him. In making this argument, N.R. does not strictly adhere to the enumerated *Mendoza-Martinez* factors. Instead, he posits arguments throughout his brief that appear to coincide with two of the

10

factors without expressly labeling them as such. Those two factors are affirmative disability or restraint and excessiveness. We discuss each in turn.

1. *Affirmative disability or restraint*

N.R. asserts that KORA's mandatory lifetime registration provisions as applied to him create an affirmative disability or restraint on his freedom of movement. N.R. focuses on the public dissemination aspect of juvenile sex offender registration as applied to him in arguing that KORA has created an affirmative restraint on his ability to find and maintain stable housing and employment. He points to his affidavit and his fiancée's affidavit for specific instances where he was unable to find housing, employment, and substance abuse treatment because of his status as an offender. He also asserts public dissemination of his information has subjected him to embarrassment and even violence from members of the community.

Under the amended and current version of KORA, juvenile offenders like N.R.— i.e., aged 14 to 17 who have committed the most serious sexual offenses—are subject to the same public dissemination requirements as their adult counterparts. In all other juvenile offender cases, KORA provides juvenile courts with the discretion to decide if an offender has to register and, if so, whether that registration is closed to the public. As the United States Supreme Court recognized in *Smith*, public dissemination of adult offender information was based on criminal records that already were public. Therefore, the court found adult offenders could not argue that public dissemination of information imposed an affirmative restraint or resembled historical shaming punishments. See *Smith*, 538 U.S. at 97-101. Can the same be said for juvenile offenders like N.R.?

The answer lies in the Revised Kansas Juvenile Justice Code (KJJC). See K.S.A. 2020 Supp. 38-2301 et seq. In Kansas, a juvenile offender's official court file—e.g.,

11

complaint, journal entries, orders—is open for public inspection. K.S.A. 2020 Supp. 38-2309(b). But the court has discretion to order that the official file be closed for juveniles under age 14 if the court determines it is not in the child's best interests. This option is not available for juvenile offenders like N.R., who were aged 14 to 17 when the crime was committed. See K.S.A. 2020 Supp. 38-2309(b). Police records and municipal court records similarly are kept confidential for juvenile offenders under the age of 14 but not for offenders aged 14 to 17. See K.S.A. 2020 Supp. 38-2310(a) and (c). So, the KJJC makes clear juvenile records for offenders aged 14 to 17 like N.R. are open for public inspection. And these specific provisions of the KJJC were in place at the time N.R. was adjudicated a sex offender in 2006, meaning he was not afforded any confidentiality protections at that time either. See K.S.A. 2005 Supp. 38-1607(b)-(c); K.S.A. 2005 Supp. 38-1608(a) and (c).

Given the juvenile court records of his rape adjudication were public at the time he was adjudicated, N.R. has failed to show that public dissemination of his registration information is sufficiently burdensome to distinguish it from adult offenders. "Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." *Smith*, 538 U.S. at 101. In the absence of distinguishing features, the public dissemination aspects of juvenile sex offender registration fail to render his registration a punitive affirmative disability or restraint amounting to punishment. See *Petersen-Beard*, 304 Kan. at 199-202.

2. *Excessiveness*

N.R. focuses much of his challenge on this factor. He makes many of the same arguments: public dissemination of his information has subjected him to embarrassment

and even violence from members of the community; and he is unable to find stable housing, employment, or substance abuse treatment programs because of his status. Accordingly, the above analysis related to these issues are incorporated and applied here.

N.R. does make a few additional arguments in challenging KORA as excessive in relation to its public safety purpose: he points to the real mental health effects it has had on him, such as depression and isolation; he has attempted suicide because of the mental health issues related to registering; he notes that KORA does not distinguish between adult and juvenile offenders; and he finally argues that KORA's lifetime registration requirements as applied to him do not serve relevant rehabilitation policy goals outlined in the KJJC.

The affidavits establish that N.R. has suffered personal harm, violence, mental health issues, and embarrassment because of public dissemination of his registration information. But as noted above, N.R. has an uphill battle to establish that his juvenile adjudication and registration information should have remained confidential following the 2011 KORA amendments.

Turning to his argument that KORA does not distinguish between adult and juvenile offenders, N.R. urges this court to consider United States Supreme Court precedent recognizing that juveniles are often less culpable and less dangerous than their adult counterparts. Because KORA fails to distinguish between adult and juvenile offenders, N.R. argues we must apply an analysis different than that in *Smith* or *Petersen-Beard* for purposes of evaluating excessiveness. N.R. relies on three United States Supreme Court decisions and one Kansas Supreme Court decision to support his argument.

In *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), the Court adopted a categorical rule precluding imposition of the death penalty on any offender under 18 years old. In adopting this rule, the Court relied on three differences between juveniles and adults: (1) the juvenile's lack of maturity and underdeveloped sense of responsibility; (2) his or her greater vulnerability and susceptibility to negative influences and outside pressures, including peer pressure; and (3) that the juvenile's character was not as "well formed" as an adult's and his or her personality traits were "more transitory, less fixed." 543 U.S. at 569-70.

In *Graham v. Florida*, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the Court held a sentence of life without parole for a juvenile offender who did not commit homicide violated the Eighth Amendment. If a state imposes a life sentence on a juvenile offender, "it must provide him or her with some realistic opportunity to obtain release before the end of that term." 560 U.S. at 82. In rejecting the harsher punishment for juveniles, the Court emphasized the characteristics of youth, identified in *Roper*, that make juveniles less culpable and less susceptible to deterrence than adults. 560 U.S. at 68-72.

In *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the Court again considered mandatory sentences of life without the possibility of parole for juveniles. It held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'" because it "runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." 567 U.S. at 465. The Court again relied on the three significant differences between children and adults, stating "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471.

As for Kansas law, N.R. relies on *State v. Dull*, 302 Kan. 32, 351 P.3d 641 (2015), to argue that his age at the time of his offense must be considered before he can be required to register for a lifetime. In *Dull*, this court held that mandatory lifetime postrelease supervision for juveniles constituted categorical cruel and unusual punishment. 302 Kan. at 61. In its analysis, this court considered United States Supreme Court and Kansas caselaw suggesting that the juvenile offender in the case had a diminished moral culpability when he committed a serious crime. 302 Kan. at 52. This court also recognized that juveniles generally have a "lower risk of recidivism" and that "[p]lacing lifetime restraints on a juvenile offender's liberties requires a determination that the juvenile will forever be a danger to society" and undermines juvenile rehabilitation. 302 Kan. at 60 (citing *Graham*, 560 U.S. at 74).

N.R. argues the differences between children and adults considered by the courts in the cases cited above to determine the harshness of sentencing apply equally to sex offender registration for juveniles. But to the extent N.R. is using the "children are different" analysis to determine whether mandatory lifetime sex offender registration for juveniles is punishment, his argument is circular. Specifically, he fails to recognize that he cannot use the *Miller* factors—applicable to harsh sentencing that is indisputably punishment—to establish that juvenile sex offender registration is punishment in the first instance. Unless he first establishes that registration is punishment, this line of cases arguably does not even apply to him. *Roper*, *Graham*, and *Miller* rely on the significant differences between children and adults in imposing the harshest *punishments*. And *Dull* is inapplicable for the same reason: that case involved lifetime postrelease supervision, which similarly is a sentencing and punishment issue. See *Martin v. Kansas Parole Board*, 292 Kan. 336, 343, 255 P.3d 9 (2011) (postrelease supervision is part of sentence).

15

The underlying rationale in *Miller*—as set forth in *Roper*, expanded in *Graham*, and further clarified in *Miller* itself—is that there are constitutionally significant differences between children and adults that "diminish the penological justifications for imposing the harshest *sentences* on juvenile offenders." (Emphasis added.) *Miller*, 567 U.S. at 472. Relying on "children's diminished culpability and heightened capacity for change," the *Miller* Court expressly stated its belief that "sentencing juveniles to this harshest possible *penalty* will be uncommon." (Emphasis added.) 567 U.S. at 479. So, the *Roper*, *Graham*, and *Miller* cases, which recognize that children are less culpable and more capable of change than adults, are relevant in determining whether the harshest *punishment* is appropriate. But under the current state of the law in Kansas, the KORA registration requirements are not punitive. See *Petersen-Beard*, 304 Kan. at 209. Because they are not punitive, the KORA registration requirements are not subject to the punishment analysis set forth in the *Roper*, *Graham*, and *Miller* cases.

N.R.'s final excessiveness argument is that the effects of the lifetime registration requirements as applied to him run contrary to the policy goals outlined in the KJJC. "The primary goals of the juvenile justice code are to promote public safety, hold juvenile offenders accountable for their behavior and improve their ability to live more productively and responsibly in the community." K.S.A. 2020 Supp. 38-2301. The first stated goal is to protect public safety. See K.S.A. 2020 Supp. 38-2301. As noted above, the goal of the KORA statutory scheme also is to protect public safety. In this context, the KORA and the KJJC goals are consistent with one another.

As for the second goal, N.R. acknowledges that the registration requirements have held him accountable for his behavior, but he argues the burden of registration on him is disproportionate to its benefits and therefore the effects of the registration requirements are excessive in relation to their public safety purpose. N.R. challenges the third goal by arguing that the registration requirements have worsened, instead of improved, his ability

16

to live more productively and responsibly in the community, which demonstrates that the burden of the registration requirements on him are excessive in relation to its public safety purpose.

The KJJC policy argument posited by N.R. is a logical fallacy; specifically, it is a red herring. A red herring is a diversionary tactic used in an argument that introduces an irrelevant issue, usually to avoid addressing the key argument. N.R.'s argument is a red herring because it introduces an irrelevant issue into the argument—that the effects of the KORA registration requirements on him are excessive given the goals of the KJJC— when the actual issue presented is whether the effects of the KORA registration requirements on him are excessive in relation to KORA's public safety purpose. That the effects of the KORA registration requirements on him may not align with the some of the nonpublic safety goals of the KJJC is immaterial to whether the registration requirements are excessive given the public safety goals of KORA. The KJJC policy argument also is not relevant because it is undisputed that N.R. was not required to publicly register as a juvenile, he is no longer under the jurisdiction of the juvenile court, and he is now an adult.

Based on the discussion above, we find the effects of the KORA lifetime registration requirements as applied to N.R. do not impose an affirmative disability or restraint and are not excessive in relation to the stated nonpunitive purpose and goal of KORA: to protect public safety. None of N.R.'s arguments demonstrate that the effects of the law as applied to him are any different than the effects of KORA's lifetime registration requirements as applied to an adult offender. As such, we conclude N.R. has failed to establish by the clearest of proof that the burdensome effects on him resulting from KORA's lifetime registration requirements are so onerous as to constitute punishment. See *Smith*, 538 U.S. at 92; *Petersen-Beard*, 304 Kan. at 195.

Having determined the lifetime registration requirements are not punishment as applied to N.R., we necessarily conclude there is no merit to the following constitutional claims submitted by N.R.: that the lifetime registration for him violates the Ex Post Facto Clause prohibiting retroactive *punishment* and the prohibition against cruel and unusual *punishment* under the Eighth Amendment of the United States Constitution and section 9 of the Kansas Constitution Bill of Rights. See *Hendricks*, 521 U.S. at 370-71 (recognizing that the Ex Post Facto Clause applies exclusively to penal statutes).

*Due Process*

N.R. argues the provision in KORA mandating public dissemination of his registration information violates his rights as enumerated in sections 1 and 18 of the Kansas Constitution Bill of Rights. Relying on the affidavits he presented to the district court, N.R. claims publication of his registration information has destroyed his reputation within the community by branding him as a sex offender. N.R. also claims that Kansas law fails to provide a mechanism for him to establish mitigating circumstances unique to his case or show that he no longer poses a threat to the community.

N.R. recognizes that this is a new constitutional argument and that this court generally does not consider such arguments on appeal. However, he asks the court to consider two exceptions: (1) this newly asserted theory poses only a question of law based on previously admitted facts and will be finally determinative of the case, and (2) consideration of this theory is necessary to "serve the ends of justice or to prevent the denial of fundamental rights." *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). The State counters, asserting that neither exception applies and that this court should disregard N.R.'s new claim. Notwithstanding the State's argument, we will address N.R.'s argument under the second exception.

Section 1 of the Kansas Constitution Bill of Rights provides, "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Section 18 of the Kansas Constitution Bill of Rights guarantees the right to a remedy. It states:  "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." This court has defined "remedy by due course of law" as the reparation for injury ordered by a court in due course of procedure after a fair hearing. *Harrison v. Long*, 241 Kan. 174, 179, 734 P.2d 1155 (1987). Remedy by due course of law refers to due process concerns. *In re Marriage of Soden*, 251 Kan. 225, 233, 834 P.2d 358 (1992).

The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. In reviewing a procedural due process claim, the court first must determine whether a protected liberty or property interest is involved. If so, the court then must determine the nature and extent of the process which is due. *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000).

N.R. claims he is entitled to due process protection because he possesses a protected liberty interest in his reputation, which he alleges is being destroyed as a direct result of public dissemination of his registration status. The concept of "liberty" is broad and includes protection of a person's good name. See *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572-73, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Relevant here, a person may be deprived of a "liberty" interest without due process if that person's standing in the community is damaged or if the person's reputation, honor, or integrity are questioned. *Winston v. State Dep't of Soc. & Rehab. Servs.*, 274 Kan. 396, 410-11, 49 P.3d 1274 (2002). The affidavits presented to the district court reflect N.R.'s belief that the public's ability to access information identifying him as a person who has been adjudicated guilty of a certain sex offense harms his reputation in the community. As such, a protected liberty interest is involved.

19

Even though N.R. sufficiently identified an interest at stake, he is not entitled to any additional process beyond his original adjudication before being subjected to KORA's registration requirements. Additional process would be necessary only where it gives a sex offender the ability to prove or disprove facts related to the applicability of the registration requirements. Here, the only fact relevant to whether registration is required is whether the juvenile adjudication exists. KORA's registration requirements turn on an offender's conviction alone, which is a fact that a convicted offender already had a procedurally safeguarded opportunity to contest. Therefore, no additional process is required for due process. See *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003) (denying procedural due process challenge to state sex offender registry where registration was required by the fact of conviction as sex offender, irrespective of any other factors, thus rendering any additional process meaningless and unnecessary). That he may be able to establish mitigating circumstances unique to his case or that he no longer poses a threat to the community are facts irrelevant to whether he is required to register under the KORA. N.R. is required to register based solely on his juvenile adjudication for rape, which explicitly triggers KORA's requirements. Because he is not challenging whether he received adequate due process in his juvenile proceeding, there is no basis for a procedural due process claim.

*Conclusion*

We conclude KORA's mandatory lifetime registration requirements as applied to N.R. are not punishment and, as a result, do not violate the federal Ex Post Facto Clause or the prohibition against cruel and unusual punishment under the Eighth Amendment of the United States Constitution and section 9 of the Kansas Constitution Bill of Rights. Although N.R. has adequately identified an interest in his reputation, we conclude he is

not entitled to any additional process beyond his original adjudication before being subjected to KORA's registration requirements.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

* * *

STANDRIDGE, J., concurring: Although I agree with the majority that *State v. Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127 (2016)—which holds lifetime registration for an adult offender is not punishment—is the governing law in Kansas, I write separately to emphasize that my agreement is grounded solely on principles of stare decisis.

The legal principles supporting the doctrine of stare decisis are well established. "[S]tare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon an 'arbitrary discretion.'" *Patterson v. McLean Credit Union*, 491 U.S. 164, 172, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989). Stare decisis ensures that "the law will not merely change erratically," which in turn "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals." *Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986).

In Kansas, "'once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting *Samsel v. Wheeler Transp. Servs., Inc.* 246 Kan. 336,

21

356, 789 P.2d 541 [1990], *overruled on other grounds by Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 [1991]). While this court is not inexorably bound by its own precedent, we should follow the law of earlier cases unless "'clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.'" *Crist*, 277 Kan. at 715.

*Petersen-Beard* held that lifetime registration for an adult offender is not punishment. N.R. acknowledges this holding but attempts to distinguish it based on his juvenile status at the time of his offense. The majority finds "[n]one of N.R.'s arguments demonstrate that the effects of the law as applied to him are any different than the effects of KORA's lifetime registration requirements as applied to an adult offender." Slip op. at 17. Given this finding, the majority necessarily relies, at least in part, on the holding in *Petersen-Beard*. Based solely on principles of stare decisis as it applies here, I agree it was proper for the majority to do so.

The only change that has occurred since the *Petersen-Beard* decision was filed is the replacement of former members of the court by new members of the court. I believe that a change in the membership of this court cannot, in and of itself, justify a departure from the basic principle of stare decisis. See *Payne v. Tennessee*, 501 U.S. 808, 850, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) (Marshall, J., dissenting) (change in court's personnel "has been almost universally understood *not* to be sufficient to warrant overruling a precedent"); *State v. Marsh*, 278 Kan. 520, 577, 102 P.3d 445 (2004) (McFarland, C.J., dissenting) ("[W]e should be highly skeptical of reversing an earlier decision where nothing has changed except the composition of the court."). Any other conclusion would send the message that whenever there is a hotly contested issue in this court that results in a closely divided decision, anyone who disagrees with the decision and has standing to challenge it need only wait until a member of the original majority

22

leaves the court to bring another challenge. In my view, that would be a very dangerous message to send. Stability in the law and respect for the decisions of the court as an institution, rather than a collection of individuals, is of critical importance in our legal system.

Indeed, even if the majority decision in *Petersen-Beard* were flawed, overruling it under these circumstances—where the only factor that has changed is the composition of the court—would inflict far greater damage on the public perception of the rule of law and the stability and predictability of this court's decisions than would abiding by the decision. See *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 854, 864, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (quoting *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 636, 94 S. Ct. 1895, 40 L. Ed. 2d 406 [1974] [Stewart, J., dissenting]: "A basic change in the law upon a ground no firmer than a change in our membership invites the popular misconception that this institution is little different from the two political branches of the [g]overnment. No misconception could do more lasting injury to this Court and to the system of law which it is our abiding mission to serve."). In my opinion, reversing a decision solely because of a change in justices on the court would cause the people we serve to raise legitimate concerns about the court's integrity and the rule of law in the state of Kansas. It is for this reason that I concur in the judgment.

\* \* \*

ROSEN, J., dissenting:  For more than 15 years I have been a proud member of a court that has historically taken an unyielding stand against the degradation of rights guaranteed by our Constitution. See *In re Adoption of Baby Girl P*., 291 Kan. 424, 242 P.3d 1168 (2010); *In re Adoption of G.L.V*., 286 Kan. 1034, 190 P.3d 245 (2008) (protecting rights of natural parents); *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016), *adhered to on reh'g* 306 Kan. 682, 396 P.3d 711 (2017) (striking down as unconstitutional statute criminalizing refusal to submit to testing of bodily substances

deemed to have been impliedly consented to); *In re L.M*., 286 Kan. 460, 470, 186 P.3d 164 (2008) (upholding juveniles' constitutional right to jury trial). Even in the era of Jim Crow and *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), this court protected civil rights against forces of discrimination. See, e.g., *Board of Education v. Tinnon*, 26 Kan. 1, 22-23 (1881) (power to divide city into districts does not include power to divide city according to race, color, nationality, or descent); *Webb v. School District*, 167 Kan. 395, 403-04, 206 P.2d 1066 (1949) (creation of special school district carved out to exclude African-American children was impermissible subterfuge for segregation).

Today, I feel none of that pride. Today, the court eschews the United States Constitution and the citizens it stands to protect for reasons I cannot comprehend. Today, I dissent.

I agreed with the majority of the court in *Doe v. Thompson*, 304 Kan. 291, 327-28, 373 P.3d 750 (2016), when we concluded lifetime registration constituted punishment for adult offenders. And I certainly believe it constitutes punishment for N.R., who was 14 years old when he committed the acts for which he was adjudicated an offender and placed on probation—not an adult convicted of a high-level felony and sent to prison— and for which our Legislature has retroactively imposed a life sentence.

I will initially consider the requirements and burdens that the Kansas Offender Registration Act (KORA) places on individuals and the negative impacts that ensue from registration. I will then explain why I do not consider this court's opinion in *State v. Petersen-Beard,* 304 Kan. 192, 377 P.3d 1127 (2016), a case with which I disagree in any event, to be constraining precedent in the present appeal. I will point out the differences between public access to juvenile adjudications and public access to sex-offender registries. I will point out the dramatic imbalance between the public benefit of offender

24

registration for juveniles and the lifetime punitive effect that such registration has on juveniles. And I will reiterate the special circumstances of juvenile behavior that distinguishes it from similar behavior committed by adults. I will conclude that registration is plainly punitive in nature, even if not in intention, and the registration statute, as applied to this appellant, is an unconstitutional ex post facto violation.

The Ex Post Facto Clause in the United States Constitution prohibits states from "pass[ing] any . . . ex post facto Law." Article I, section 10. A law violates this prohibition when it "'increase[s] the severity of [the] punishment'" after the crime was committed. *State v. Todd*, 299 Kan. 263, 278, 323 P.3d 829 (2014) (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S. Ct. 960, 67 L. Ed. 2d 17 [1981]). The first step in analyzing whether legislation violates this constitutional directive is determining whether it constitutes punishment. In making this assessment, this court applies the "intent-effects" test. Under this framework, we deem legislation punishment when it is punitive either in purpose or effect—even if the Legislature intended a "regulatory scheme this is civil and nonpunitive." To assist with this analysis, this court has turned to the factors utilized by the United States Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963):

> "the degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to the identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a crime." *Petersen-Beard*, 304 Kan. at 198 (citing *Mendoza-Martinez*, 372 U.S. at 168).

The United States Supreme Court has noted that the first five factors are the "most relevant." *Smith v. Doe*, 538 U.S. 84, 97, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003).

The State alleged that when N.R. was 14 years old, he committed acts that, if he had been an adult, would have supported a charge for rape. N.R. pleaded guilty and was adjudicated an offender. A magistrate judge then suspended the imposition of sentence and placed N.R. on probation. The court also ordered N.R. to register as a sex offender "locally" for a period of five years. Shortly before this time expired, the Kansas Legislature enacted legislation requiring N.R. to register for life. N.R. acknowledges that the Legislature intended KORA be civil and nonpunitive but argues the requirement he register for the rest of his life is punitive in effect when applied to him.

KORA requires N.R. to register—in person—at least four times per year. When he is experiencing homelessness, he must register every 30 days and describe every place he has slept and frequented since the last registration and every place he intends to sleep and frequent until the next registration. K.S.A. 22-4905. He must also register in person anytime he moves, experiences a change in employment status, alters his school attendance, uses temporary lodging for seven or more days, or if any of the following things commence, change, or terminate:  name, telephone number, identifying physical characteristics, occupation, employer, driver's license, identification card, vehicle information, professional licenses, designations, certifications, treatment for "mental abnormality or personality disorder," email addresses, online identities, personal web pages, travel documents, or name and telephone number of probation officer. K.S.A. 2020 Supp. 22-4905(h); K.S.A. 2020 Supp. 22-4907. If N.R. manages to keep up with these requirements, much of this information is posted on an easily accessible offender registration website that members of the public may peruse at their leisure. K.S.A. 2020 Supp. 22-4909. If N.R. fails to fulfill the requirements, he can be prosecuted and sentenced to years of prison time, even though he was never confined in a juvenile correctional facility when he was adjudicated an offender for the underlying offense. K.S.A. 2020 Supp. 22-4903; K.S.A. 2020 Supp. 21-6804.

N.R. presented evidence that these onerous requirements have wrought havoc on his attempts to move beyond his adjudication and function within his community. To be brief, registration has caused him to experience homelessness, created barriers to substance abuse treatment, forced him apart from his family, created insurmountable financial strain, severely compromised his mental health, and put his life in danger. Countless jurists, scholars, and social scientists have confirmed how common these burdens are to those required to register. See *E.B. v. Verniero*, 119 F.3d 1077, 1102 (3d Cir. 1997) (registration causes registrants and families "profound humiliation and isolation," jeopardizes employment and housing, destroys relationships, and spurs "'vigilante justice,'" frequently enough "that registrants justifiably live in fear"); Tewksbury, *Exile at Home: The Unintended Collateral Consequences of Sex Offender Residency Restrictions*, 42 Harv. C.R.-C.L. L. Rev. 531, 533 (2007) (offender registrants report several collateral consequences, "including employment difficulties, relationship problems, harassment, stigmatization, and persistent feelings of vulnerability"); Prescott, *Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism*, 48 Conn. L. Rev. 1035, 1056-57 (2016) (registration causes difficulty with finding employment, securing housing, and maintaining relationships); Zevitz & Farkas, Sex Offender Community Notification: Assessing the Impact in Wisconsin, 9 (Washington D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, 2000) (77% of offender registrants reported "being humiliated in their daily lives, ostracized by neighbors and lifetime acquaintances, and harassed or threatened by nearby residents or strangers").

The suggestion that these requirements and their effects are not punitive is simply wrong. But today's majority shrugs its shoulders and tosses these realities aside. It points out that a previous majority of this court held mandatory lifetime registration for adult offenders did not constitute punishment for purposes of a cruel and unusual punishment analysis. Slip op. at 8 (citing *Petersen-Beard*, 304 Kan. 192). It takes the untenable

position that, although the State action may be burdensome, it is not technically "punishment" and is therefore permissible. This position is at odds with authority holding that State action need not be intended to be punitive in nature for it to violate constitutional protection. See, e.g., *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (indifference to prisoner needs may create constitutional claim); *Trop v. Dulles*, 356 U.S. 86, 95, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (even clear legislative classification of statute as "non-penal" does not alter fundamental nature of plainly punitive statute); see also *Ingraham v. Wright*, 430 U.S. 651, 684, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977) (White, J., dissenting) (state actions that are so cruel that they are not permitted as penal acts must not be permitted in non-penal contexts).

The majority avoids mentioning that, instead of meaningful analysis, much of the *Petersen-Beard* decision consisted of string cites to federal cases in which courts considered whether other state registration schemes were punitive. See *Petersen-Beard*, 304 Kan. at 214 (Johnson, J., dissenting) (observing that majority looks to federal caselaw even though "[o]rdinarily, any analysis of a Kansas legislative act would not begin with a consideration of merely persuasive federal authority when there are decisions of this court on point"). Then, it considers whether there is anything different about N.R.'s circumstances that would make mandatory lifetime registration punitive for him. It ultimately concludes the registration requirements are not so onerous as to constitute punishment for N.R. Slip op. at 17. Such a stunning conclusion leaves one at a loss as to what, if any, condition KORA could create that the majority would consider onerous.

In its first point, the majority rejects N.R.'s claim that the registration requirements cause an affirmative disability or restraint by making it difficult for him to find employment and housing and subjecting him to shame and ostracization in his community. The majority reasons that these consequences come from his juvenile

28

adjudication, and those court records are already public, so the registration adds no disability or restraint. Slip op. at 12. The majority relies entirely on the United States Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), to come to this conclusion. Slip op. at 11. In *Smith*, the Court concluded that mandatory lifetime registration requirements under Alaska's registration scheme for an adult offender added no affirmative disability or restraint because the offender's conviction was already public. 538 U.S. at 101.

There is a glaring oversight with the majority's reasoning: it pays no attention to the difference between N.R.'s juvenile record being "open for public inspection" and registration on a sex offender database. There are, in fact, very consequential differences. To discover that N.R. was adjudicated for a sex offense through his juvenile record, one must travel to the courthouse, pay a fee, and look up his file on the public database. Alternatively, one can enter personal information into the Kansas Bureau of Investigation's (KBI) website to create an online account, pay a fee, and then look up N.R.'s record. In either case, one must at least know N.R.'s name to complete the search. The KBI website will also ask for N.R.'s birth date. I suspect most people are unaware they can do either of these things. In contrast, any person with internet access can look to see whether N.R. is on the sex offender registry without creating an account and without cost. In fact, one need not even know N.R.'s name to find him on the registry. Anyone can plug in an address and see the names and locations of registered sex offenders in any area they wish. People can find N.R. without looking for him.

In *Thompson*, this court noted the problem with relying on the 2003 *Smith* decision to hold that registration is akin to having a public criminal record. We observed that the *Smith* Court described the Alaska registration system as a "passive" one and compared it to "physically visiting 'an official archive of criminal records.'" *Thompson*, 304 Kan. at 321 (quoting *Smith*, 538 U.S. at 99). Such a description, we explained, is "antiquated in

today's world of pushed notifications to listservs and indiscriminate social media sharing." *Thompson*, 304 Kan. at 321 And we pointed out that, since *Smith*, the Supreme Court has "recognized the vast amount of data that is currently available to most citizens on their smartphones and that 'a cell phone [can be] used to access data located elsewhere, at the tap of a screen.'" (Quoting *Riley v. California,* 573 U.S. 373, 397, 134 S. Ct. 2473, 189 L. Ed. 2d 430 [2014].) Other scholars have advanced similar criticisms. See, e.g. Carpenter, *A Sign of Hope:  Shifting Attitudes on Sex Offense Registration Laws*, 47 Sw. L. Rev. 1, 25 (2017) ("[w]hen *Smith* was decided in 2003, the Internet's impact may not have been as well known or understood. So much so that the Court in *Smith* concluded that providing a name, address, and conviction on a public registry was tantamount to that same information being made available in a court-created public document").

It is clearly much simpler to get to N.R.'s adjudication from his registration than from his public record. But, even more disabling than this easy access is the fact that, once N.R.'s name is registered, he is officially *on the list*. To the public, being on the sex offender registry is a severe and serious marker; the government has deemed the people on this list so dangerous they need to be accounted for and identified to those around them. A law review article opines that "[s]ex offenders have supplanted insanity acquittees as the most despised segment of the American population." Cucolo & Perlin, *"They're Planting Stories in the Press":  The Impact of Media Distortions on Sex Offender Law and Policy,* 3 U. Denv. Crim. L. Rev. 185, 207 (2013). The authors note that people so labeled are "[r]egularly reviled as 'monsters' by district attorneys in jury summations, by judges at sentencings, by elected representatives at legislative hearings, and by the media" and that "correctional officers rate sexual offenders as more 'dangerous, harmful, violent, tense, bad, unpredictable, mysterious, unchangeable, aggressive, weak, irrational, afraid, immoral and mentally ill' than other prisoners." 3 U. Denv. Crim. L. Rev. at 207-08. Another article explains "[a]s a result of the media's

depiction of a one-dimensional 'sex offender' in broadcast news and newspaper articles, the general public has conceptualized what it believes to be the prototype of this 'monstrous imminent evil'—a male who violently attacks young children who are strangers." Cucolo & Perlin, "*The Strings in the Books Ain't Pulled and Persuaded": How the Use of Improper Statistics and Unverified Data Corrupts the Judicial Process in Sex Offender Cases*, 69 Case W. Res. L. Rev. 637, 644 (2019). This kind of stigma is debilitating; N.R. attested to the ostracization and death threats to which he's been subject since his registration.

These shocking barriers to N.R.'s ability to move beyond his juvenile adjudication and live a life outside the shadow of that event undoubtedly add an affirmative disability and restraint to N.R.'s life beyond what "public access" to his juvenile record does. The Legislature has constructed a scheme that equates to an effective banishment. This court has acknowledged this before. *State v. Myers*, 260 Kan. 669, 695, 923 P.2d 1024 (1996) (KORA imposes affirmative disability or restraint because "[u]nrestricted public access to the registered information leaves open the possibility that the registered offender will be subjected to public stigma and ostracism" making it "impossible for the offender to find housing or employment"). And scholars have noted this reality for other registrants. See Prescott, *Portmanteau Ascendant:  Post-Release Regulations and Sex Offender Recidivism*, 48 Conn. L. Rev. 1035, 1055 (2016) ("most agree that carrying the label 'sex offender' is an order of magnitude more difficult to surmount" than "[c]riminal records alone"). The majority's quick dismissal of N.R.'s arguments—without any actual analysis of what registration means for him against the internet of today and the instantaneous access to information via social media—is callously dismissive and grossly blind to realities of the present day.

Next, the majority summarily dismisses N.R.'s argument that "public dissemination of his information" is excessive in relation to its purpose. It concludes that

the analysis regarding whether the public dissemination adds an affirmative disability or restraint resolves this claim, too. Slip op. at 12-13. In doing so, it ignores the crux of the question this factor presents:  Is there an acceptable balance between the punitive effects of registration on N.R.'s life and registration's contribution to public safety? The answer is no.

The majority notes that the requirements N.R. faces are imposed in the name of public safety. But studies have shown that, in contrast to what the Supreme Court said in 2003, the risk of recidivism among sex offenders is not "frightening and high." *Smith*, 538 U.S. at 103 (quoting *McKune v. Lile,* 536 U.S. 24, 34, 122 S. Ct. 2017, 153 L. Ed. 2d 47 [2002]). It is, in fact, remarkably low. A Department of Justice study looked at the criminal records of 272,111 released prisoners in 15 states over a designated period of time. Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994 1 (2003). It found that only 5.3 percent of sex offenders in the study were arrested for a new sex offense and only 3.5 were convicted. Bureau of Justice Statistics at 1, 2. In contrast, the overall rearrest rate for non-sex offenders was 68 percent. Bureau of Justice Statistics at 2.

As scholars could have predicted, the registries appear to have had little effect on recidivism rates. A 2011 study found "little evidence to support the effectiveness of sex offender registries." Agan, *Sex Offender Registries:  Fear Without Function?* 54 J.L. & Econ. 207, 208 (2011). Many commentators have written about the failings of these registries. See, e.g. Huffman, *Moral Panic and the Politics of Fear:  The Dubious Logic Underlying Sex Offender Registration Statutes and Proposals for Restoring Measures of Judicial Discretion to Sex Offender Management*, 4 Va. J. Crim. L. 241, 257 (2016) ("a large majority of lawmakers acknowledge that strict legislative initiatives have led to no appreciable reduction in sexual misconduct"); Caldwell et al., *An Examination of the Sex Offender Registration and Notification Act as Applied to Juveniles, Evaluating the Ability*

32

*to Predict Sexual Recidivism*, 14 Psychol. Pub. Pol'y & L. 89, 91 (2008) (citing multiple studies to support the notion that "[e]xtant research has not supported the effectiveness of sex offender registration and notification at reducing recidivism with adults").

And research reveals that registries, by and large, give us information we do not need. In his article "Sex Panic and Denial," Corey Rayburn Yung explains that "[f]amily members, friends, or other persons known to the victim commit approximately 93 percent of sexual offenses against children . . . ." Yung, *Sex Panic and Denial*, 21 New Crim. L. Rev. 458, 465 (2018). Thus, "[t]he prototypical fear-based myth . . . that there are a plethora of convicted sex offenders lurking in the bushes ready to attack any passing child or other victim" is false. 21 New Crim. L. Rev. at 465. If nearly all former juvenile offenders are not lying in wait to accost a stranger, then I can see no reason to publicly brand all of them for the rest of their lives as if they are.

Finally, N.R. argues that KORA's registration requirements are excessive because they were imposed as a result of a juvenile adjudication. N.R. claims that, as a juvenile, he was "less culpable and less predatory than adults," and "less likely to reoffend and more amenable to treatment than adults." Consequently, he argues, imposing the same registration requirements to him as the scheme would impose on a convicted adult offender is excessive. For support, N.R. cites cases from this court and the United States Supreme Court that identify differences between child offenders and adult offenders. See *State v. Dull*, 302 Kan. 32, 52, 351 P.3d 641 (2015) (juvenile offenders have a "diminished moral culpability" compared to an adult offender); *Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) ("juveniles have diminished culpability and greater prospects for reform"); *Graham v. Florida.*, 560 U.S. 48, 69, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (same); *Roper v. Simmons*, 543 U.S. 551, 569-70, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (juveniles have "'lack of maturity and an underdeveloped sense of responsibility,'" "are more . . . susceptible to negative influences

33

and outside pressures," and "character" "is not as well formed" so "personality traits . . . are more transitory, less fixed").

N.R.'s argument brings the punitive effect of his lifetime registration requirement sharply into focus. If he is less culpable than his adult counterpart, and he is less likely to endanger the public, treating him as if he is just as menacing is indefensible. Social scientists and scholars have confirmed that juvenile offenders are distinct from adult offenders. A report compiled by Human Rights Watch explains:

> "It is axiomatic that children are in the process of growing up, both physically and mentally. Their forming identities make young offenders excellent candidates for rehabilitation—they are far more able than adults to learn new skills, find new values, and re-embark on a better, law-abiding life. . . .

> . . . .

> "Adolescent thinking is present-oriented and tends to ignore, discount, or not fully understand future outcomes and implications. Children also have a greater tendency than adults to make decisions based on emotions, such as anger or fear, rather than logic and reason. And stressful situations only heighten the risk that emotion, rather than rational thought, will guide the choices children make. Research has further clarified that the issue is not just the cognitive difference between children and adults, but a difference in 'maturity of judgment' stemming from a complex combination of the ability to make good decisions and social and emotional capability.

> . . . .

> "MRI (magnetic resonance imaging) images of the anatomy and function of the brain at different ages and while an individual performs a range of tasks reveal the immaturity of the portions of children's brains associated with reasoning and emotional equilibrium. . . .

> . . . .

"Moreover, the fact that young people continue to develop into early adulthood suggests that they may be particularly amenable to change. . . . Both criminologists and development experts agree that '[f]or most teens, these [risky or illegal] behaviors are fleeting. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.'" Human Rights Watch, Raised on the Registry: The irreparable Harm of Placing Children on Sex Offender Registries in the US 25-27 (2013), available at https://www.hrw.org/report/2013/05/01/raised-registry/irreparable-harm-placing-children-sex-offender-registries-us#.

A recent study confirms this assessment. It considered 106 different analyses of recidivism rates among juvenile sex offenders between 1938 and 2014. The most recent data set, captured between 2000 and 2015, reported a mean recidivism rate for juveniles of 2.75 percent. Caldwell, *Quantifying the Decline in Juvenile Sexual Recidivism Rates*, 22 Psychol. Pub. Pol'y & L. 414 (2016). A 2008 study assessed the effects of federal registration requirements on juvenile offenders. It observed that they were "based on the assumption that juvenile sex offenders are on a singular trajectory to becoming adult sexual offenders." But the authors of the study concluded "[t]his assumption is not supported by [the study's] results, is inconsistent with the fundamental purpose of the juvenile court, and may actually impede the rehabilitation of youth who may be adjudicated for sexual offenses." 14 Psychol. Pub. Pol'y & L. at 105.

The research demonstrates that lifetime registration for a juvenile offender has no rational connection to its purported purpose. This is true for N.R., who committed acts when he was 14 years old for which he was *adjudicated an offender*—not criminally prosecuted and convicted of a high-level felony, as an adult would have been—and placed on probation. Our justice system did not deem N.R. too dangerous to be outside the confines of a correctional facility; based on the facts before it, the court treated him like the developing, reformable juvenile he was. But the Kansas registration scheme takes no heed of this detail. It subjects N.R. to lifetime registration, which amounts to

potentially 80 or so years of quarterly (at least), in-person registration that has and will continue to wreak havoc on N.R.'s life. For the rest of his days, he is branded a sex offender for all to see. This is in light of the reality that N.R. is highly unlikely to reoffend. This means that lifetime registration for N.R. is unrelated to a nonpunitive purpose, and, consequently, grossly excessive.

These observations provide more than enough to establish that lifetime registration has a punitive effect on N.R. The remaining *Mendoza-Martinez* factors that the Supreme Court has considered significant in deciding whether legislation is punitive strengthen this conclusion. Blasting N.R.'s name, identifying characteristics, and location across the internet with a bright red "sex offender" designation is akin to historical public shaming and humiliation tactics. See *Smith*, 538 U.S. at 116 (Ginsburg, J., dissenting) ("public notification regimen, which permits placement of the registrant's face on a webpage under the label 'Registered Sex Offender,' calls to mind shaming punishments once used to mark an offender as someone to be shunned"); *People in Int. of T.B.*, 489 P.3d 752, 767 (2021) (registration for juvenile resembles traditional punishments of humiliation and shaming, especially in "era of social media").

Although not part of the majority analysis, this factor demands our collective attention because the impact of shame and humiliation cannot be overstated. As one set of authors have explained, "'Shame is bordered by embarrassment, humiliation, and mortification, in porous ways that are difficult to predict or contain," and is one of the most important, painful, and intensive of all emotions.'" Perlin & Weinstein, *"Friend to the Martyr, a Friend to the Woman of Shame": Thinking About the Law, Shame and Humiliation*, 24 S. Cal. Rev. L. & Soc. Just. 1, 7 (2014) (quoting Massaro, *The Meaning of Shame: Implications for Legal Reform*, 3 Pyschol. Pub. Pol'y & L. 645, 648 [1997]; Svensson et al., *Moral Emotions and Offending: Do Feelings of Anticipated Shame and Guilt Mediate the Effect of Socializing on Offending?* 10 Eur. J. Criminology 2, 3

[2012]). And "humiliation is the emotional experience of being lowered in status, usually by another person. There is the associated sense of powerlessness." Cucolo & Perlin, *Promoting Dignity and Preventing Shame and Humiliation by Improving the Quality and Education of Attorneys in Sexually Violent Predator (SVP) Civil Commitment Cases*, 28 U. Fla. J.L. & Pub. Pol'y 291, 292 (2017). It is "'the rejection of human beings as human, that is, treating people as if they were not human beings but merely things, tools, animals, subhumans, or inferior humans.'" Bernstein, *Treating Sexual Harassment with Respect*, 111 Harv. L. Rev. 445, 489 (1997) (quoting Margalit, The Decent Society 121 [1996]). I cannot ignore such a punitive effect.

The registration requirements also serve the traditional punitive aims of retribution and deterrence. As I've noted, the registration scheme offered no individual assessment of N.R.'s risk of recidivism or general danger to society. Because these requirements "punish a juvenile for his past conduct without regard to the threat—or lack thereof—that the juvenile currently poses," they are, by nature, retributive. *People in Int. of T.B.*, 489 P.3d at 768 (citing *Smith*, 538 U.S. at 109 [Souter, J., concurring]); see also *Thompson*, 304 Kan. at 325 ("such arbitrariness is inherently retributive"). As far as deterrence, even the Supreme Court in *Smith* acknowledges that the registration requirements could have a natural deterrent effect. 538 U.S. at 102. This court noted the same in *Myers*. 260 Kan. at 695 ("Registration has an obvious deterrent effect.").

My colleagues may be comfortable to keep their heads in the sand and blindly "follow" a 2003 Supreme Court case that considers a different registration scheme and offers an outdated analysis. But when I look at the research and the arguments, I see the truth before us: lifetime registration for a 14-year-old offender is, unmistakably, punishment. My conclusion is not out of line with caselaw from other parts of the country. Across the nation, courts are creeping out of the shadow of *Smith* and declaring registration requirements punitive. See *Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir.

2016) (Michigan's registration scheme punitive because it "severely restricts where people can live, work, and 'loiter,' . . . categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, . . . requires time-consuming and cumbersome in-person reporting" and is "supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe"); *People v. Betts*, No. 148981, 2021 WL 3161828, at *12 (Mich. 2021) (Michigan registration requirements punitive because they publicize wealth of information, encourage social ostracism, impose state supervision, serve to deter, are retributive because they offer no individualized assessment, and are excessive because their efficacy is unclear at best); *Starkey v. Oklahoma Dep't of Corr.*, 305 P.3d 1004, 1030 (Okla. 2013) (Oklahoma's registration scheme punitive because its "many obligations impose a severe restraint on liberty without a determination of the threat a particular registrant poses to public safety"); *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 430 Md. 535, 568, 62 A.3d 123 (2013) (registration scheme as applied to offender violated state constitution's ex post facto clause because it had "essentially the same effect . . . as . . . probation" and imposed "shaming for life"); *Wallace v. State*, 905 N.E.2d 371, 379-84 (Ind. 2009) (Indiana's registration scheme punitive in effect because it creates "significant affirmative obligations," and "severe stigma," encourages "vigilante justice," resembles shaming punishments, probation, or parole, sometimes requires a finding of scienter, promotes deterrence and retribution, applies to already criminal behavior, and is excessive in relation to purpose because there is no individual assessment of risk). And in a case that is notably reminiscent of the one before us, the Supreme Court of Colorado recently held that lifetime registration for a juvenile offender, who was twice adjudicated an offender for sexual offenses, was punitive and violated the prohibition against cruel and unusual punishment. *People in Int. of T.B.*, 489 P.3d 752 (Colo. 2021). The court was particularly swayed by the reality that "lifetime sex offender registration for juveniles does not bear a rational connection to, and is excessive in relation to, [the registration scheme's] nonpunitive purposes of protecting the community

and aiding law enforcement." *T.B.*, 489 P.3d at 768. The court came to this decision after noting that juvenile offenders have a high capacity for reform. *T.B.*, 489 P.3d at 768.

I do not suggest that N.R.'s offense was inconsequential or should be overlooked. But I do suggest that we must follow our constitutional imperatives. N.R. is—very clearly—being punished by the Legislature's "civil scheme." The majority's refusal to acknowledge this is inexplicable. To put it plainly, in the words of my recently retired colleague, the majority's holding is "wrong-headed and utterly ridiculous. . . . [I]n the real world where citizens reside, registration is unequivocally punishment." *State v. Perez-Medina*, 310 Kan. 525, 540-41, 448 P.3d 446 (2019) (Johnson, J., dissenting). Consequently, I would hold that N.R.'s lifetime registration requirement violates the Ex Post Facto Clause because it was enacted and imposed after N.R. committed the actions that led to his adjudication.